Greene, 1959, 30 N.J. 395, 153 A.2d 49, 75 A.L.R.2d 1153, at p. 1175 et seq.

It is true that in a few American jurisdictions in which estates by the entirety are recognized the courts have held that the interest of a husband in such an estate is still subject to the claims of his individual creditors during the joint lives of the spouses, qualified only by the possibility that the wife may become entitled to the whole estate upon surviving him. See King v. Greene, 1959, 30 N.J. 395, 153 A.2d 49, 75 A.L.R. 2d 1153, and cases cited in the note to that case at p. 1183. This, however, is very much a minority view and we are satisfied that it runs directly counter to the basic common law concept of the estate by the entirety which is that it is based upon the legal unity of the spouses as if they constituted a juristic third person, with the property being held by each spouse seized of the whole and not of a share or divisible part. As we have pointed out above it is the view of the great majority of those American jurisdictions which recognize the estate by the entirety that since the enactment of the Married Women's Property Acts this unity of estate is indestructible by the unilateral act of either spouse so long as the marriage subsists. With this view we agree and since it represents the common law rule as generally understood and applied in the United States it must be regarded as the rule in this territory in the absence of local law to the contrary. 1 V.I.C. § 4. It is clear that the local law of the Virgin Islands is not to the contrary. For the estate by the entirety was not known in the Virgin Islands until September 1, 1957 when it was introduced by title 28, § 7, of the Virgin Islands Code. At that time the Virgin Islands Married Women's Property Acts, 16 V.I.C. §§ 68, 69, which had been enacted by the Colonial Councils as Title II, ch. 14, §§ 1 and 2, of the 1921 Municipal Codes, had been in force for more than 35 years. Title 28, § 7, of the Virgin Islands Code, did not define the nature and incidents of the estate by the entirety the creation of which it author-ized, however, and thus necessarily left them, pursuant to title 1, § 4, V.I.C., to the common law rules generally applied in those American states which recognize the estate by the entirety and in which Married Women's Property Acts are in force. For this reason, also, the majority view of those states, which holds that a creditor of one spouse may not reach his interest in property held by the entirety while both spouses are alive, must be regarded as the law of this territory. It follows that the interest of the defendant, Harry Tees, in the real property which he and his wife hold as tenants by the entirety is not subject to seizure and sale under the judgments rendered against him alone in these cases.

A judgment will accordingly be entered in each case reversing the order of the Municipal Court and remanding the cause with directions to enter an order staying the sale in question.

**SHELL OIL COMPANY, a corporation**

v.

**VILLAGE OF HARTFORD, a municipal corporation.**

No. 3915.

United States District Court
S. D. Illinois, S. D.
March 1, 1968.

J. Fred Schlafly, Alton, Ill, for plaintiff.

John B. Coppinger, Alton, Ill., for defendant.

## OPINION AND ORDER

ROBERT D. MORGAN, District Judge.

The only real and ultimate issue in this case, a civil suit to quiet title tried before the court without a jury, is whether the public has acquired by prescription an easement over land now improved with a bituminous and rock-surfaced road, 16 to 20 feet wide and variously referred to as the "Shell road," "Rand Avenue," or "an extension of Rand Avenue." [1] The court, having reviewed the evidence adduced at the two-day trial and having considered the scholarly briefs filed in behalf of the respective parties, concludes as a matter of law that the public has not acquired prescriptive rights in the roadway.

The evidence is not seriously in dispute. The court makes the following specific findings of fact:

1. The plaintiff, Shell Oil Company, holds clear record title to the real estate in question, having acquired

---

1. The road runs west from U.S. Route 3 to the Mississippi River through real estate described as follows: a strip of land fifty (50) feet in width in the South half of Section Thirty-three (33), Township Five (5) North, Range Nine (9) West, of the Third Principal Meridian, lying immediately south of the East and West half Section line extending through said Section 33 and being bounded on the North by the said East and West Half Section line, and paralleling the same and extending from the Mississippi River east to said U.S. Highway No. 3, situated in the village of Hartford, Madison County, Illinois.

title by conveyance on November 24, 1917.

2. As early as 1903 individual members of the public went from the old St. Louis and Alton Wagon Road, predecessor to the present Highway 3, through the general area in question on foot and by horse and buggy and automobile to visit friends living on the river bank, to fish, and just "to look around."

3. The real estate in question has never been removed from the tax rolls and taxes have continuously been paid thereon.

4. Shell has continuously improved and maintained the road without assistance from public authorities.

 The defendant and counterplaintiff Village of Hartford bases its claim on § 2–202 of the Illinois Highway Code (Ill.Rev.Stats., Ch. 121, § 2–202):

"Highway—any public way for vehicular travel which has been laid out in pursuance of any law of this State, * * * or which has been established by dedication, or used by the public as a highway for 15 years, * * *."

The Illinois Supreme Court in a long and consistent line of decisions has held that such public use must be open, continuous, uninterrupted, adverse, not permissive, and under a claim of right as well in order for the public to acquire prescriptive rights. E. g., Doss v. Bunyan, 262 Ill. 101, 104 N.E. 153 (1914); Stengl v. Starr Bros., 370 Ill. 118, 18 N.E. 2d 179 (1938); Stevenson v. Meyer, 10 Ill.2d 335, 139 N.E.2d 740 (1957); and People v. Waitkus, 30 Ill.2d 335, 196 N. E.2d 668 (1964). The Court of Appeals for the Seventh Circuit has also recognized that in Illinois "the doctrine of adverse possession must be construed strictly in favor of the owner of the title to the land." Marathon Oil Co. v. Heath, 358 F.2d 34, 38 (1966). The parties hereto have stipulated that Shell holds good record title to the disputed road (TR. 6).

 Under the theory of the *Waitkus* opinion, the latest Illinois decision in point, the public use herein was not made under any claim of right because "the public authorities [did] acts inconsistent with a claim of right in the public." Specifically, as in *Waitkus*, the public authorities have taxed the property in question as private property, taken dedications thereof, and never based a request for motor fuel taxes on the road. Moreover, the village never required that Shell secure permits for the various improvements it made above, below, and beside the road though the village did require that Shell secure permits for similar improvements on other admittedly public property.

In *Waitkus*, the evidence showed that " * * * in a few isolated instances the township commissioner may have done some minor work on the road at different times." Even so, the court decided: "These acts fall far short of any claim of right in the public." In the instant case the only evidence of any public maintenance was from a witness who "remembered" that "once" the county road superintendent went down "'there" and "filled a couple of holes." (TR. 145) Otherwise, the evidence is undisputed that Shell alone maintained the road.

 Furthermore, there is no persuasive evidence that the public use was continuous and uninterrupted. It is not denied that after 1926 Shell periodically closed the road whenever repairs were made and on occasion apparently as an exercise of dominion. For example, two witnesses testified that customarily the road was closed once a year for twenty-four hours (TR. 234, 249–50). The defendant suggests that such testimony should be discounted because the witnesses are former Shell employees. The court, however, is inclined to believe that those Shell employees who regularly used the road are more likely to be familiar with closings than particular members of the general public who occasionally went down the road on pleasure drives.

Defendant, apparently recognizing the difficulty of proving continuous and un-interrupted use by the public after 1926, urges in his brief the proposition that the public acquired prescriptive rights in the road at a very early, although unspecified, date, prior to Shell's acquisition of title in 1917. There is evidence that some members of "the public" did pass through the general area to and from the river bank as early as 1903, but it is not clear that they traveled any clearly defined route or road. One of the men who made the survey for the installation of a private 36 inch sewer line in 1926 testified that trees were growing in what is now the roadway and had to be cut down. He declined to characterize the old path as a "road," likening it to a "walk." Another man who worked on the layout for the sewer line described it as "a wild country road" and "a field road." Until Shell laid down the sewer in 1926, there was no "well-defined line of travel," and the public can claim no prescriptive rights therein. Swinford v. Roper, 389 Ill. 340, 344, 59 N.E.2d 863 (1945).

■ Moreover, the use to which defendant's witnesses testified was not sufficient to establish prescriptive rights in the public. More than mere travel over a road must be shown before the public gains prescriptive rights over it. Town of Brushy Mound v. McClintock, 150 Ill. 129, 36 N.E. 976 (1894); O'Connell v. Chicago Terminal Transfer R. R. Co., 184 Ill. 308, 56 N.E. 355 (1900). In Koch v. Mraz, 334 Ill. 67, 77, 165 N.E. 343 (1929), the public used the road in many of the same ways the public did here, and the court concluded:

"The driveways through this territory are and have been but little used by the public to travel from one locality to another as highways are generally used. The traffic has had to do almost entirely with the particular use to which the lots have been put. A road laid out and kept up by the owners of the grounds over which it lies will not become a public highway merely

because, for a period of 15 or more years, there was not continuous or frequent objection to its use in going to and from the lots in that territory. To so hold would render the ownership of private drives precarious, indeed. The fact that strangers may have driven in to view the grounds is not evidence that such use was under adverse claim of right in the public so to do."

The cases relied upon by the defendant do not provide solid support for its argument and do not require a result contrary to the one reached here. Three of the cases cited, for example, involve road-ways which constituted the only reasonable means of ingress and egress from farms or businesses. The instant road connects only with another private road and the Shell dock facilities. In yet another of the cases, the road in question had been maintained by public authorities and motor fuel taxes had been collected on it; and it is therefore clearly distinguishable from the present suit.

■ Finally, there is considerable evidence that all use in recent years was permissive rather than adverse. For some several years past, at least, Shell has had posted alongside the road the following sign:

THIS IS A
PRIVATE ROAD
OWNED BY
SHELL OIL CO.
USE OF WHICH IS ONLY
BY OWNER PERMISSION
REVOCABLE AT WILL

It is not denied that at least from 1940 to date Shell guards have patrolled the road, asking non-employees to leave on occasion. What may have been the attitude of Shell's predecessors in title to public use of the road does not appear from the evidence, but use of open roads of private origin is presumed permissive. City of Chicago v. Chicago, R. I. and Pacific Ry. Co., 152 Ill. 561, 38 N.E. 768 (1894); City of Chicago v. Borden, 190 Ill. 430, 60 N.E. 915 (1901); Koch v. Mraz, 334 Ill. 67, 165 N.E. 343 (1929);

and Swinford v. Roper, 389 Ill. 340, 59 N.E.2d 863 (1945).

Accordingly, judgment is entered in favor of the plaintiff and counter-defendant.